1   Sandra A. Crawshaw-Sparks (State Bar No. 291101)
    scrawshaw@proskauer.com
2   Susan L. Gutierrez (State Bar No. 273980)
    sgutierrez@proskauer.com
3   PROSKAUER ROSE LLP
    2049 Century Park East
4   32nd Floor
    Los Angeles, California 90067-3206
5   Telephone:   (310) 557-2900
    Facsimile:   (310) 557-2193
6
7   Attorneys for Plaintiff
    National Academy of Recording Arts & Sciences, Inc.

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12  NATIONAL ACADEMY OF               Case No.
    RECORDING ARTS & SCIENCES, INC.,
13  a Delaware nonprofit corporation,   CV14-0652 RSWL-Ex

                                        COMPLAINT FOR BREACH OF
14                Plaintiff,            CONTRACT AND DEMAND FOR
                                        JURY TRIAL
15       vs.

16  HITLAB INC., a Canada corporation,

17                Defendant.

18

19

20

21

22

23

24

25

26

27

28

FILED
2014 JAN 28  PM 1:12
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: _____

Plaintiff National Academy of Recording Arts & Sciences, Inc. ("The Recording Academy"), by its attorneys, Proskauer Rose LLP, for its complaint against defendant Hitlab Inc. ("Hitlab"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because The Recording Academy is a citizen of Delaware with its principal place of business in Santa Monica, California; Hitlab is a citizen of a foreign state (Canada) with its principal place of business in Quebec, Canada; and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the subject agreement was entered into in California and a substantial part of the events giving rise to The Recording Academy's claims occurred in this judicial district.

3. Hitlab has consented to jurisdiction and venue in this Court, as provided in Paragraph 8(e) to the Standard Terms and Conditions of the agreement between The Recording Academy and Hitlab, a true and correct copy of which is attached hereto as Exhibit A. Paragraph 8(e) provides in part:

> "THE CALIFORNIA COURTS (STATE AND FEDERAL), SHALL HAVE SOLE EXCLUSIVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT . . . THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS."

## THE PARTIES

4. The Recording Academy is a Delaware not-for-profit corporation with its principal place of business located at 3030 Olympic Boulevard, Santa Monica, California 90404. The Recording Academy has over 18,000 members. For more than 50 years, The Recording Academy has represented the individuals who contribute to the creation and exploitation of recorded music, including recording

1

artists, musicians, songwriters and record producers.  Among other activities, The Recording Academy presents the annual GRAMMY® Awards ceremony.  The GRAMMY Awards ceremony is telecast throughout the world.

5.   On information and belief, Hitlab is a Canadian corporation with a principal place of business at 600 de Maisonneuve Blvd. West, suite 2750, Montreal, Quebec, H3A 3J2, Canada.  On information and belief, Hitlab operates a global social media network that, among other things, connects and promotes artists, musicians, and songwriters both online and through related events.

### FACTS COMMON TO ALL COUNTS

6.   In or about September 2012, the parties entered into a Licensing and Promotional Partner Agreement (the "Initial Agreement") whereby Hitlab agreed to pay a fee to The Recording Academy, in an amount and manner set forth below, in consideration for, among other things:  (i) the limited and non-exclusive license to designate itself (Hitlab) as a presenting sponsor for certain events; (ii) the limited and non-exclusive right to display and reproduce the GRAMMY word mark for certain purposes and events; and (iii) various benefits related to events held by or on behalf of The Recording Academy.  (*See* Ex. A §§ 3-4.)

7.   On or about February 4, 2013, the parties amended the Initial Agreement by letter (the "First Amendment" and together with the Initial Agreement, collectively, the "Agreement").  A true and correct copy of the First Amendment is attached hereto as Exhibit B.

8.   Section V(a) of the Initial Agreement provides in part:

> "In consideration for the Designation Grant, the GRAMMY Identification License and the Benefits during each Contract Year of the Term, [Hitlab] shall pay to The Recording Academy an amount equal to One Million One Hundred Seventy Five Thousand Dollars ($1,175,000) (the "Fee") which Fee shall be paid in full by [Hitlab] to The Recording Academy in two (2) installments as follows:

(i) for the first Contract Year, (1) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,000) within 30 days after the full execution of this [Initial] Agreement, and (2) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,000) on or before January 1, 2013; and

(ii) for the second Contract Year, (1) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,000) on or prior to September 1, 2013 and (2) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,000) on or before January 1, 2014"

9. The First Amendment changed the payment schedule for the first Contract Year under Section V(a) of the Agreement as follows:

"(i) for the first Contract Year, (1) Six Hundred Seventy-Four Thousand Nine Hundred Forty Dollars ($674,940) upon the full execution of this Agreement, and (2) Five Hundred Thousand Dollars ($500,000) on or before February 8, 2013"

10. On or about May 17, 2013, The Recording Academy voluntarily extended the time for Hitlab to remit the $500,000 due and unpaid under Section V(a)(i) of the Agreement, from February 8, 2013 to June 17, 2013.

11. Hitlab has performed its obligation to pay the $647,940 due to The Recording Academy under Section V(a)(i) of the Agreement.  However, Hitlab did not and has not performed its obligation to remit the remaining $500,000 due and unpaid to The Recording Academy under Section V(a)(i) of the Agreement.

12. On or about August 22, 2013, The Recording Academy requested that Hitlab perform its obligation to remit the $500,000 due and unpaid to The Recording Academy under Section V(a)(i) the Agreement.  Hitlab failed and refused to do so.

13. Hitlab further did not perform its obligation to remit either of the $587,500 installments under Section V(a)(ii) of the Agreement, leaving a total of One Million One Hundred Seventy-Five Thousand Dollars ($1,175,000), due and unpaid to The Recording Academy.

14.     As a result of Hitlab's breach of the Agreement, The Recording Academy has incurred damages in the total of One Million Six Hundred and Seventy-Five Thousand Dollars ($1,675,000), together with prejudgment and post-judgment interest thereon as allowed by law.

### FIRST CLAIM FOR RELIEF

#### For Breach of Contract

15.     The Recording Academy incorporates by reference paragraphs 1 through 14, inclusive, as though fully set forth herein.

16.     The Agreement constitutes a valid and enforceable written contract between The Recording Academy and Hitlab.

17.     The Recording Academy has performed all acts, services, covenants and conditions required on its part to be performed in accordance with the terms and conditions of the Agreement, except as such performance was prevented or excused by the conduct of Hitlab.

18.     Hitlab has materially breached its contractual obligations to The Recording Agreement pursuant to the terms and conditions of Agreement by failing to remit the $1,675,000 due and unpaid to the Recording Academy thereunder.

19.     As a direct and proximate result of Hitlab's material breaches, The Recording Academy has been damaged in the amount of $1,675,000, together with prejudgment and post-judgment interest thereon as allowed by law.

### PRAYER FOR RELIEF

WHEREFORE, The Recording Academy prays for a judgment against Hitlab Inc. as follows:

A.     For compensatory damages in the sum of One Million Six Hundred and Seventy-Five Thousand Dollars ($1,675,000);

B.     For prejudgment and post-judgment interest thereon as allowed by law;

C.     For costs of suit; and

D.  For such other and further relief as this Court may deem to be just and proper.


DATED:  January 28, 2014

Sandra A. Crawshaw-Sparks
Susan L. Gutierrez
PROSKAUER ROSE LLP


By: _Sandra A. Crawshaw-Sparks_
       Sandra A. Crawshaw-Sparks

Attorneys for Plaintiff
National Academy of Recording Arts &
Sciences, Inc.

## **DEMAND FOR JURY TRIAL**

Plaintiff National Academy of Recording Arts & Sciences, Inc. hereby demands a trial by jury.

DATED:  January 28, 2014

Sandra A. Crawshaw-Sparks
Susan L. Gutierrez
PROSKAUER ROSE LLP

By: *Sandras, Crawshaw-Spark*
Sandra A. Crawshaw-Sparks

Attorneys for Plaintiff
National Academy of Recording Arts &
Sciences, Inc.

EXHIBIT A

## LICENSING AND PROMOTIONAL PARTNER AGREEMENT - MULTI-JURISDICTIONAL

This **LICENSING AND PROMOTIONAL PARTNER AGREEMENT - MULTI-JURISDICTIONAL** (this "Agreement"), is made and entered into this _____ day of September, 2012 (the "Effective Date"), by and between **National Academy of Recording Arts & Sciences, Inc.**, a Delaware non-profit corporation, with an office address at 3030 Olympic Boulevard, Santa Monica, California 90404 ("The Recording Academy"), and **Hitlab Inc.**, with an office address at 600 de Maisonneuve Blvd. West, Suite 2750, Montreal, Quebec, H3A 3J2, Canada ("Company").

### I. Term and Defined Terms:

(a)  Term. The term of this Agreement shall commence on the Effective Date and expire on September 30, 2014, unless earlier terminated as provided in this Agreement (the "Initial Period"). Thereafter, The Recording Academy shall have the right to renew this Agreement, upon written notice given to Company no later than the expiration of the Initial Period, for one (1) additional period, to commence, if at all, on October 1, 2014 and, if not earlier terminated as provided herein, expire on September 30, 2015 (the "Renewal Period" and together with the Initial Period, collectively, the "Term").

(b)  Defined Terms. In addition to the terms defined above and those terms defined in the text of this Agreement, the following capitalized terms shall have the following respective meanings for the purpose of this Agreement:

"Annual Awards Program" means, individually, as the context requires, any of (i) the 55th GRAMMY Awards, currently scheduled to be Telecast in February 2013 (the "55th Awards Program"); (ii) the 56th GRAMMY Awards, currently scheduled to be Telecast in February 2014 (the "56th Awards Program"), and (iii) if applicable, the 57th GRAMMY Awards, currently scheduled to be telecast in February 2015 (the "57th Awards Program"). The term "Annual Awards Programs" shall mean, collectively, the 55th Awards Program, the 56th Awards Program and, if applicable, the 57th Awards Program.

"Contract Year" means each successive period of twelve (12) months occurring during the Term (except for the first Contract Year, which shall commence on the Effective Date).

"Net Profits" means, respecting each Contract Year, on a Contract Year by Contract Year basis, the aggregate sum of One Hundred Percent (100%) of all worldwide gross earnings, payments, royalties, revenues, amounts, monies and fees, including guarantees, advances, deposits and commissions, paid, payable or credited, in any country, to Company, or any other revenue and/or income participant, including TVZone, and any of their affiliates, respecting that certain music based TV show (with whatever title(s) created, hosted and/or produced in full or in part by Company, TVZone (and/or any of their respective affiliates) and currently anticipated to be broadcast initially in China (the "Music TV Show") derived, resulting or proceeding (" from or as a result of the exploitation of, in connection with, as part of, or relating to, the Music TV Show, with such gross revenues to include (i) cash; and (ii) in-kind value received by Company ("Gross Revenues"), minus (a) direct third-party costs pursuant to that annual budget approved in writing by Hitlab and TVZone (a copy of which shall be provided annually to The Recording Academy) and (b) all taxes and governmental fees required to be paid by Hitlab and TVZone as required by the People's Republic of China law ("Governmental Fees"). Not in limitation of the foregoing, "Gross Profits" shall include, but not be limited to (1) advertising revenue, distribution fees, SMS revenue, sales and syndication via any broadcast media, in each case now or hereafter existing (including, without limitation, free, basic, cable, satellite and their international equivalents), (2) home video/DVD/pay/electronic sell through, pay per view, and their international equivalents, (3) Internet streaming and download (including advertising revenue related thereto), mobile communications revenue, revenue from and related to bounties and in-transit revenue, (4) format purchases outside China, (5) ticketing, merchandising, audio-only (e.g., ring-tones, streaming, etc.) and/or audio-visual licensing and downloading, and publishing received on account of or in connection with any properties or assets respecting such Music TV Show and all spin-offs and derivative productions, such as live concert or touring events, festivals, conferences, etc. of any of the foregoing, (5) all revenue received from, on account of, or in connection with agreements, contracts and/or arrangements entered into with Music TV Show contestants (including, without limitation, recording, publishing, management, live performance, touring, endorsements, sponsorship, merchandising, tie-in, and all other ancillary revenues such as TV, theatrical, etc.), (6) use, subscription and/or any type of fees, payments, royalties or revenues relating to the use, exploitation and monetization of the DHS, CYS and Hitmap technologies during the Term, in each case as such relates to the Music TV Show wherever broadcast (under whatever names) and (7) resulting from the use, exploitation or monetization of the www.qix.com website.

"POTY" means those annual Person of the Year Tributes, occurring during the Term, if any, which are hosted each year by the MusiCares Foundation to honor an artist and raise funds for the MusiCares Foundation.

"SMRS" means that certain so-called "Social Media Rockstars Summit" hosted by The Recording Academy and currently anticipated to occur the Friday before each Annual Awards Program occurring during the Term.

**II.    Terms and Conditions**:  The provisions of Exhibit A (Standard Terms and Conditions) shall apply to this Agreement and are hereby incorporated herein by reference and shall constitute for all purposes a component part of this Agreement.

**III.   Licenses and Exclusivity**:

(a)    Designation Grant.  Subject to the terms, conditions and obligations of this Agreement, The Recording Academy hereby grants to Company a limited, non-exclusive, non-sublicenseable and non-transferable license to designate itself, solely within the applicable Licensed Territory (as defined below) and during the Term, as a presenting sponsor of: (i) each official "VIP Post-SMRS Reception" occurring during the Term; and (ii) each so-called "SMRS Music Performance" component portion of the SMRS occurring during the Term (collectively, the "Designation Grant").

(b)    GRAMMY Identification License.  Subject to the terms, conditions and obligations of this Agreement, The Recording Academy hereby grants to Company a limited, non-exclusive, non-sublicenscable (except as is specifically provided in III(b)(iii), below) and non-transferable license, to display and reproduce the GRAMMY Word Mark (as defined below) solely in order to (i) promote the Designation Grant throughout the applicable Licensed Territory during the Term,  (ii) to promote, solely via on-line and radio media,  within the applicable Licensed Territory the availability of the Annual Awards Grand Prize Trip (as defined below) during each Contract Year's respective TV Show Broadcast Period (as defined below) but in no event during the Blackout Period, and (iii) to sublicense to Changsha Broadcasting Group the right to use the GRAMMY Word Mark to promote solely via their radio network and solely in China, the availability of the Annual Awards Grand Prize Trip during each Contract Year's respective TV Show Broadcast Period but in no event during the Blackout Period  (the "GRAMMY Identification License"). For purposes hereof, "GRAMMY Identification" means, collectively, solely the name "GRAMMY" (the "GRAMMY Word Mark" and that other logo (the "Gramophone Logo") expressly identified on Schedule 1, attached hereto; and "TV Show Broadcast Period" means the period commencing on that date which each Contract Year's Chinese Music TV Show first publically commences broadcasting and ending on January 31 of each Contract Year; and "Blackout Period" means the period commencing on February 1 of each Contract Year and ending on February 28 of such Contract Year.

(c)    Website.  Subject to the terms, conditions and obligations of this Agreement, The Recording Academy hereby grants to Company a limited, non-exclusive, non-sublicenseable and non-transferable license to (A) designate itself, on the website located at www.hitlab.com , www.facebook.com/hitlab and or www.qix.com during the Term, as presenting sponsor of: (i) each official "VIP Post-SMRS Reception" occurring during the Term; and (ii) each so-called "SMRS Music Performance" component portion of the SMRS occurring during the Term; and (B) to display the GRAMMY Word Mark on such website solely for such designation purposes, and for no other purposes,during the Term (the "Website Use").

**IV.    Benefits**: The Recording Academy shall do and undertake, or cause to be done and undertaken, each of the following benefits for Company, for each Contract Year of the Term (the "Benefits"):

(a)    Annual Awards Program Tickets:  The Recording Academy shall provide to Company, at no additional cost to Company, the following tickets (collectively, the "Tickets") for admission to each Annual Awards Program occurring during the Term: (i)  sixteen (16) Gold tickets; and (ii) six (6) so-called "Silver Tickets." Company shall not sell any of the Tickets (except for charitable purposes with The Recording Academy's prior written consent), and shall only have the right to distribute the Tickets, at no additional cost to Company, to its executives, current and prospective business contacts and their families or for other non-commercial uses; provided, however, Company shall be permitted to utilize the "Silver Tickets" as experiential prizes for Approved Promotional Sweepstakes (as defined below) and/or the Annual Awards Grand Prize Trip. Without limiting the generality of the foregoing, at no time shall Company act in derogation or violation of The Recording Academy's ticketing policies and guidelines as

provided to Company by The Recording Academy from time to time during the Term (the "Ticket Policies"). In the event that Company distributes any of the Tickets in accordance with this Section, Company shall ensure that all recipients of the Tickets abide by the Ticket Policies.

The Recording Academy shall make available to Company, on a right to purchase basis, a pre-designated (by The Recording Academy) allotment of "Gold" and "Silver" tickets to each Annual Awards Program occurring during the Term, with such right to purchase to automatically expire thirty (30) days prior to the applicable, corresponding Annual Awards Program, if not exercised, on or before such date. Any additional tickets to the any such Annual Awards Program shall be reviewed and approved by The Recording Academy on case-by-case basis, subject to availability at the time of Company's request for such tickets. Company shall agree to purchase said Annual Awards Program tickets at fair market value. Company acknowledges that, in the event that Company exercises its right-to-purchase said tickets, The Recording Academy shall not be obligated to release any tickets to Company until payment is received from Company.

(b)     After Party Passes:  The Recording Academy shall provide to Company, at no additional cost to Company, twenty-two (22) passes to each After Party (as defined below) occurring during the Term (collectively, the "After Party Passes"). Company shall have no right to distribute After Party Passes, other than the limited right to distribute the After Party Passes, at no additional cost to Company, to its executives, current and prospective business contacts and their families or for other non-commercial and promotional uses; provided, however, Company shall be entitled to utilize six (6) After Party Passes as experiential prizes for Approved Promotional Sweepstakes and/or the Annual Awards Grand Prize Trip. Without limiting the generality of the foregoing, at no time shall Company act in derogation of The Recording Academy's general policies with respect to After Party Passes, as such policies may be modified from time to time by The Recording Academy. For purposes hereof, "After Party" means that certain party hosted by The Recording Academy that occurs promptly following the corresponding, applicable Annual Awards Program, which (i) may be attended by performers, presenters, sponsors and VIP guests of the corresponding, applicable Annual Awards Program, and (ii) is intended to honor the winners, nominees and VIP guests of the corresponding, applicable Annual Awards Program.

(c)     VIP Table.  The Recording Academy shall cause to be provided to Company, for no additional consideration, one (1) so-called "Platinum VIP Table" to each POTY occurring during the Term (each, a "POTY Table Pass"). The Recording Academy currently estimates such "Platinum VIP Table" will seat no more than twelve (12) attendees. Company shall not sell any of the POTY Table Passes (except for charitable purposes with The Recording Academy's prior written consent), and shall only have the right to distribute the POTY Table Passes free of charge to its executives, current and prospective customers, business contacts and their families or for other non-commercial uses.

(d)     Pre-GRAMMY Gala.  The Recording Academy shall cause to be provided to Company, at no additional cost to Company, one (1) table to each so-called "Pre-GRAMMY Gala" occurring during the Term.  The Recording Academy currently estimates that such table will seat no more than twelve (12) attendees. Company shall not sell any of the foregoing table passes (except for charitable purposes with the Recording Academy's prior written consent) and shall only have the right to distribute such passes, at no additional cost to Company, to its executives, current and prospective business contacts and/or their families for non-commercial uses.

(e)     SMRS Benefits.

     (i)     Passes.  The Recording Academy shall provide to Company, at no additional cost to Company, two (2) media passes and ten (10) VIP audience guest passes to each SMRS occurring during the Term. Company shall not sell any of the foregoing passes (except for charitable purposes with the Recording Academy's prior written consent) and shall only have the right to distribute such passes, at no additional cost to Company, to its executives, current and prospective business contacts and/or their families for non-commercial and promotional uses.

     (ii)     Press Release.  At a mutually agreed upon date during the Term, Company shall be permitted to service a press release discussing the relationship created under this Agreement. Notwithstanding the foregoing, the text of such press release shall be subject to the mutual written approval of The Recording Academy.

     (iii)     Booth.  Company shall be entitled to provide, at Company's cost and expense, a Company branded display booth (which may feature Akon) at each SMRS occurring during the Term (the "Company Booth"), the si

and location of which shall be determined by The Recording Academy. All aspects of each such Company Booth shall be subject to The Recording Academy's prior written approval. Company shall be permitted to display Company products for purposes of sampling and acknowledges that Company shall not be permitted to sell any Company products at any such SMRS. Subject to Company obtaining any and all Third Party Rights (as defined below), Company shall be permitted to interview artists at each such Company Booth solely for airing such interviews during and via its on-line radio show during the Term.

(iv)  Branding. The Recording Academy shall include an element of the Company Identification (if commercially practical to do so) on the SMRS performance stage for SMRS occurring during the Term. Such signage shall be in a size and manner consistent with other official sponsors of the applicable, corresponding SMRS. Company also shall be entitled to placement of the Company Identification (subject to The Recording Academy's prior written approval) on collateral materials (e.g., lanyards, napkins, table tents) for each SMRS which contain logos of such SMRS sponsors.

(v)  Digital Media. Subject to the terms and conditions of this Agreement and commencing on the Effective Date and ending upon the expiration of the Term, The Recording Academy agrees to use commercially reasonable efforts to (if commercially practicable):

(A)  Grammy.com Page. place an item of Company Identification on The Recording Academy's designated "branded content section" of www.grammy.com, such placement at a location within such section to be determined solely by The Recording Academy.

(B)  Social Media. use commercially reasonable efforts to promote the Designation Grant and highlight at least one song which is performed live by each year's Hit List Competition grand prize winner from its live performance at the corresponding, applicable SMRS via The Recording Academy's primary Twitter, YouTube and Facebook accounts (the "Social Media Platform").

(C)  Blog. incorporate a dedicated blog so that such Hitlab Competition grand prize winner can blog about his or her GRAMMY Week experiences.

(vii)  Competition/Sweepstakes and Experiential Prizes.

(A)  In General. Subject to the terms and conditions hereof, the Recording Academy shall permit Company to engage in a GRAMMY themed "Emerging Artist Competition" each Contract Year of the Term pursuant to which it is currently contemplated that components of the foregoing of each competition will include permitting artists and/or recording groups to submit their own original content to www.hitlab.com (the "Contest Content"), and through a process established by Company, and approved in writing by The Recording Academy. Company will select up to three (3) finalists artists/groups which Company will cause to play (at Company's cost and expense including travel and lodging) during a designated portion of the 45 minute performance slot immediately after the panel portion of each SMRS occurring during the Term with these finalists artists/group's performance, subject to the Company obtaining all Third Party Rights, to be streamed live via the so-called "GRAMMY Live Initiative" occurring in each Contract Year during the Term with the following key dates: November 1 of each Contract Year, - launch of competition; January 15 of each Contract Year - top 10 finalists announced and January 27 of each Contract Year - 3 finalists artists/groups announced (the "Hitlab Competition"). Each Contract Year's winner will be crowned on a to be mutually determined date each Contract Year of the Term by public votes. Any and all competitions (including, the Hitlab Competition), sweepstakes and contests proposed to be held by Company ("Promotional Contest/Sweepstakes"), shall be subject to The Recording Academy's prior written approval in accordance with this Section. In the event that any Promotional Contest/Sweepstakes are approved pursuant to this Section, Company agrees that, in connection with those Promotional Contest/Sweepstakes, it shall be solely responsible for: (1) payment of all taxes and fulfillment of all tax reporting obligations arising from such Promotional Contest/Sweepstakes; (2) the design, administration, execution and all operational and implementation elements of any Promotional Contest/Sweepstakes; (3) the distribution of any tickets or packages as Promotional Sweepstakes prizes or giveaways; (4) prize fulfillment for any Promotional Contest/Sweepstakes; (5) legal compliance for any Promotional Contest/Sweepstakes in all applicable jurisdictions; and (6) obtaining, at its sole expense any and all necessary Third Party Rights (as defined herein)

4

clearances from entrants and winners relating to, or constituting any part of, any Promotional Contest/Sweepstakes. Prior to distribution of any Promotional Contest/Sweepstakes materials by Company or by any third party on Company's behalf pursuant to this Agreement, Company agrees that it will provide to The Recording Academy copies of the proposed official rules of such Promotional Contest/Sweepstakes for prior written approval, which approval shall not be unreasonably withheld or delayed (if so approved, an "Approved Promotional Sweepstakes"). Company shall comply with all statutes, ordinances, rules and regulations, as such are interpreted and enforced as of the date of the applicable promotional sweepstakes, applicable to the conduct of the promotional contest/sweepstakes anywhere in the applicable Licensed Territory. Any review or approval by The Recording Academy of any of the foregoing material shall not be deemed to imply that The Recording Academy has determined that any such materials comply with all such applicable laws.

(B)  Experiential Prizes. It is contemplated that as part of each Hitlab Competition experiential prizes may be awarded by Company, which may include, subject to the prior written approval of The Recording Academy, a so-called "Walk the GRAMMY Red Carpet with the Stars" prize for two (2).

(C)  Company Mentions. All mentions of the Hitlab Competition by Company in any media shall be accompanied by prominent GRAMMY messaging directing listeners to "Watch the [insert applicable year] Annual GRAMMY Awards. LIVE 8PM Feb [insert applicable date]. Only CBS."

(D)  Radio. Subject to the terms, conditions and obligations of this Agreement, The Recording Academy hereby grants to Company a limited, non-exclusive, non-sublicenseable and non-transferable license to utilize the GRAMMY Word Mark to announce the availability of each Contract Year's Hitlab Competition, solely via and as part of the programming content for those audio-only radio broadcasts of Akon's radio program transmitted in the applicable Licensed Territory during the Term (the "Limited Radio Use").

(f)  Gift Bags. Company shall be entitled to provide a mutually agreed upon in writing Company product for visibility in each so-called "GRAMMY Gift Bag" given to nominees, presenters and VIP guests of each Annual Awards Program occurring during the Term (currently estimated to be approximately 175 pieces). Subject to the prior written approval by The Recording Academy such product could include a so-called "Rock Star Gift Pack."

(g)  Music TV Show. Subject to the terms and conditions of this Agreement, Company shall be permitted to include up to three (3) prize packages (for two people each) to attend each Annual Awards Program occurring during the Term as a prizing component to be awarded to the grand prize winner of the annual Music TV Show (the "Annual Awards Grand Prize Trip"); provided that, notwithstanding the foregoing, in no event shall any advertiser associated or affiliated with any Music TV Shows conflict with any category of products or services offered or made available by any licensee, sponsor or promotional partner of The Recording Academy now or hereafter existing whose sponsorship, licensing and/or promotional rights extend to, inter alia, China. Subject to the foregoing, as of the Effective Date the current sponsors of The Recording Academy include Gucci, Hilton, Mastercard, Hyundai, Pepsi, Harman, Delta and MGM Resorts International. For avoidance of doubt, Company acknowledges that it will not use any element of the GRAMMY Identification in connection with any aspect of the foregoing TV shows other than solely and exclusively to promote the availability of the Annual Awards Grand Prize Trip. It is understood by the parties that the Company will have the right to promote the Annual Awards Grand Prize Trip at it's annual Chinese New Year's concert as part of its announcement of the ten Chinese finalists to complete on the Music TV Show (this shall include, inter alia, that Company shall not use any element of the GRAMMY Identification as part of the title or name of such music-based TV show or any events in connection therewith). Nothing contained herein shall be deemed to restrict The Recording Academy from providing prize packages which include Annual Awards Program attendance experiential prize components to any third party at any time during the Term.

## V.  Fee, Revenue Share and Other Consideration:

(a)  Fee. In consideration for the Designation Grant, the GRAMMY Identification License and the Benefits during each Contract Year of the Term, Company shall pay to The Recording Academy an amount equal to One Million One Hundred Seventy Five Thousand Dollars ($1,175,000) (the "Fee") which Fee shall be paid in full by Company to The Recording Academy in two (2) installments as follows:



(i)     for the first Contract Year, (1) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,500) within 30 days after the full execution of this Agreement, and (2) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,500) on or before January 1, 2013; and

(ii)     for the second Contract Year, (1) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,500) on or prior to September 1, 2013, and (2) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,500) on or before January 1, 2014; and

(iii)     if applicable, for the third Contract Year, (1) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,500) on or prior to September 1, 2014, and (2) Five Hundred Eighty-Seven Thousand Five Hundred Dollars ($587,500) on or before January 1, 2015.

The payment of the foregoing amounts shall be made in funds via wire transfer to Wells Fargo Bank, NA., Account No. 4375649050, ABA Expense Coverage No. 121000248, Account Name: National Academy of Recording Arts & Sciences, Inc., Reference: Hitlab Payments.

(b)     Revenue Share.  Net Profits respecting each Contract Year shall be distributed by Company as follows: Company , any other revenue or income participant, including TVZone, and any of their respective affiliates  shall retain, in the aggregate ninety percent (90%) of Net Profits (the "Company Share") and pay The Recording Academy ten percent (10%) of Net Profits (the "TRA Share").  Company shall compute the amounts payable to The Recording Academy under this Section V(b) and shall render to The Recording Academy an accounting statement detailing the amounts owed, along with the payment of the TRA Share, in each case, no later than May 15 of the relevant Contract Year.  Company shall keep and maintain complete and accurate books and records (in such reasonable detail as to allow The Recording Academy to determine the correctness of any and all TRA Share payments as well as with respect to all Gross Profits, Net Profits and TRA Share calculated pursuant hereto) during the Term and for a period of three (3) years thereafter at its principal place of business covering all transactions related to this Agreement. The Recording Academy may retain a nationally recognized independent auditor to review and audit Company's relevant records to confirm the performance of payment obligations under this Agreement upon thirty (30) days prior written notice.  If the audit shows an underpayment for any period of time, then Company shall, within thirty (30) days after completion of such audit, pay or credit such underpaid amounts to The Recording Academy, in addition to any payment of any Make-Up Payment set forth below.  All expenses associated with such audit shall be paid by The Recording Academy unless the audit reveals an underpayment of more than five percent (5%) in payments required hereunder, in which event Company shall pay the reasonable and documented cost of such audit.

(c)     Make-Up Payment.  In the event that, respecting any Contract Year of the Term, The Recording Academy actually receives less that the TRA Share of Net Profits, Company shall have the obligation to remit directly to The Recording Academy the difference between the amount of the TRA Share of Net Profits actually received by The Recording Academy and the TRA Share that The Recording Academy was entitled to receive hereunder (a, "Make-Up Payment").

## VI.     Territory.

(a)     Definition of Licensed Territory.  For purposes hereof, the defined term "Licensed Territory" means, respectively, the following jurisdictions:

(i)     the United States of America, Canada, France and China respecting solely the GRAMMY Word Mark and the Gramophone Logo for use of the Designation Grant;

(ii)     the United States of America, Canada, France and China respecting solely the GRAMMY Word Mark and the Gramophone Logo for use of the GRAMMY Identification License granted solely in Section III (b)(i), above, to promote the Designation Grant;

(b)     Additional Territory.  With respect to any country throughout the world not included within the definition of Licensed Territory as it relates to the use of each of the GRAMMY Word Mark and the Gramophone Logo, as applicable (each such country, an "Additional Territory"), The Recording Academy also grants the Designation Grant, the GRAMMY Identification License and the Limited Radio Use; provided, however, notwithstanding anything to the contrary stated in this Agreement, The Recording Academy makes no representations or warranties with respect to the GRAMMY Word Mark or the Gramophone Logo anywhere in the Additional Territory.

6

(c)     Foreign License Recordation Requirements. Upon The Recording Academy's request, Company agrees to assist The Recording Academy in recording this Agreement with appropriate authorities in non-United States jurisdictions (if applicable).

| The Recording Academy:<br>National Academy of Recording Arts & Sciences, Inc.<br><br>By:<br>Name & Title: Evan Greene, Chief Marketing Officer<br>12/01/12 | Company:<br>Hitlab Inc.<br><br><br>By: _____<br>Name & Title: Pierre Gauthier, Chairman |
| --- | --- |

Exhibit A

Licensing and Promotional Partner Agreement

Standard Terms and Conditions

## 1.   Termination.

(a)   Early Termination.  Notwithstanding anything to the contrary, in addition to all other remedies available at law or in equity, either party may earlier terminate the Term (i) if the other party materially breaches this Agreement and fails to cure such breach (if curable) within thirty (30) days after written notice thereof from the non-breaching party, or (ii) effective immediately upon written notice to the other party in the event of (A) the filing by the other party of a petition in bankruptcy or insolvency, (B) the appointment of a receiver for the other party for all or substantially all of its property relevant to the business activities under this Agreement, (C) the making by the other party of any assignment or attempted assignment for the benefit of creditors for all or substantially all of its properties relevant to its business activities under this Agreement, or (D) the institution of any proceedings for the liquidation or winding up of the other party's business or for the termination of its corporate charter, if any such proceeding is not dismissed within ninety (90) days of institution.

(b)   Effect of Termination.  Upon the end of the Term for any reason (expiration or earlier termination), all licenses and other rights granted to Company pursuant to this Agreement will immediately terminate, including, without limitation, the Designation Grant, the Website Use, the Limited Radio Use and/or the GRAMMY Identification License, and Company shall not thereafter use or make reference to the Designation Grant and/or the GRAMMY Identification except as expressly provided in this Agreement, make any other reference whatsoever to The Recording Academy, SMRS or any Annual Award Program anywhere.

## 2.   Company Identification License.

(a)  Grant by Company.  Company hereby grants to The Recording Academy and its authorized designees, during the Term and within the Territory, the non-exclusive limited right and license (the "Company License") to display the Company Identification for the purposes, and in such media, as contemplated in this Agreement. "Company Identification" means, collectively, those names, trademarks, words, marks, logos, designs and emblems of Company identified on *Schedule 2*, hereto.

(b)  Approval Rights.  The Recording Academy acknowledges and agrees that Company has an interest in maintaining and protecting the image and reputation of the Company Identification, and in order to accomplish this purpose, Company must in all cases assure itself that the Company Identification is used only in a manner consistent with the standards established by Company.  The Recording Academy agrees that Company must, therefore,

have the right to examine and to approve or disapprove in advance of use and in writing the contents, appearance and presentation of any and all advertising, promotional and all other materials or other items, proposed to be used in connection with any advertising or promotion utilizing the Company Identification.  The Recording Academy agrees that it will not produce, publish or in any manner use or distribute any such advertising, promotional or other materials that have not, in each instance, been submitted to and approved in writing in advance by Company.

(c)  Approval Process.  The Recording Academy agrees to submit to Company for its examination and approval or disapproval, in advance of use, a sample of each of the materials and items described in Section 2(b) together with the script, text, coloring, storyboards, and photographs proposed to be used by The Recording Academy. Company agrees that, within five (5) business days, it will examine and either approve or disapprove such submissions, and that Company will notify The Recording Academy in writing of its approval or disapproval within such period. Company agrees that it will not unreasonably delay approval of any such submission. If any submission is disapproved, The Recording Academy will be advised in writing of the specific reasons for disapproval in each case, which writing shall accompany the notice of disapproval. Any materials submitted hereunder shall be deemed to have been disapproved if approval is not expressly granted in writing within such five (5) business day period, unless otherwise agreed in writing by the parties. Notwithstanding anything to the contrary, if Company disapproves (or fails to approve) any suggested use of the Company Identification reasonably and in good faith proposed by The Recording Academy in connection with the fulfillment of The Recording Academy's obligations hereunder, then The Recording Academy shall automatically be deemed to have satisfied such obligation and shall not be in breach of this Agreement.

(d)  Restrictions and Limitations.  The Recording Academy agrees that (A) nothing contained in this Agreement shall grant to The Recording Academy any right, title or interest in the Company Identification, except for the limited rights granted pursuant to this Agreement; (B) each and every element of the Company Identification is and shall be the sole and exclusive property of Company; and (C) any and all use by The Recording Academy of the Company Identification, and the goodwill associated therewith, will inure to the exclusive benefit of Company. The Recording Academy agrees that it will not during the Term, or thereafter, use or seek to register any trademark, service mark, trade name or other indicia consisting of or incorporating any of the Company Identification, or **variations thereof, or commit any act which, except as expressly provided in this Agreement, represents or which has the effect of representing that Company manufactures,**

1

distributes, sponsors, approves, licenses or is in any manner associated and/or affiliated with The Recording Academy's goods and/or services; or otherwise infringe or cause to be infringed Company's rights with respect to the Company Identification.

**3.     Approval Rights and Style Guide.**

(a) Approval Rights. Company acknowledges and agrees that The Recording Academy has a paramount interest in maintaining and protecting the image and reputation of the GRAMMY Identification, The Recording Academy, any SMRS, Annual Awards Program, After Party, POTY or so-called "Pre-GRAMMY Gala" (collectively, the "Events") and that, in order to accomplish such purpose, The Recording Academy must be assured that the GRAMMY Identification is used only in a manner consistent with the standards established by The Recording Academy and consistent with its tax-exempt purposes. Accordingly, Company agrees that The Recording Academy shall, therefore, have the right to examine and to approve or disapprove, in The Recording Academy's sole discretion, in advance of use and in writing, the contents, appearance and presentation of any and all advertising, promotional materials and other items or other materials created by Company that incorporate the GRAMMY Identification, or that make reference, in any way, to the Designation Grant, The Recording Academy, the Events and/or any of The Recording Academy's affiliates ("Company Materials"). Company shall not produce, publish, or in any manner use, display, disseminate, or distribute any Company Materials that have not, in each instance, been submitted to The Recording Academy, and approved in writing in advance by The Recording Academy.

(b) Approval Process. Company shall submit to The Recording Academy, for its examination and approval or disapproval, in advance of each initial use, a sample of each applicable proposed item of Company Material together with, if applicable, the script, text, coloring, storyboards, and photographs proposed to be used in connection therewith. The Recording Academy agrees that it will use commercially reasonable efforts to examine and either approve or disapprove each such submission within three (3) business days and promptly notify Company of its approval or disapproval in writing. Any materials submitted hereunder shall be deemed to have been disapproved if approval is not expressly granted in writing within such three (3) business day period, unless otherwise agreed in writing by the parties.

(c) Style Guide. Company shall follow the style guide and/or guidelines specific to the marketing campaign for the corresponding, applicable Annual Awards Program (the "Campaign Elements") provided by The Recording Academy, as such style guide may be modified from time to time, and shall have the appropriate approved legal line and legend on each and every item of Company Materials.

**4.     Limitations/Exclusions.**

(a) Advertising.     Notwithstanding     anything contained in the Agreement to the contrary:

(A)     Company     acknowledges     and agrees, that (i) The Recording Academy does not control and has no responsibility for the advertising rights and advertising sold or published in any medium in connection with any Annual Awards Program, including the Telecast and any subsequent telecast of any Annual Awards Program, radio broadcasts of any Annual Awards Program or any other Event, webcasts of any Annual Awards Program or any other Event, and print advertising for the any Annual Awards Program or any other Event; (ii) such advertising rights and advertising are controlled by third-parties; and (iii) this Agreement does not grant to Company any rights to advertise itself, any of its products in connection with or during the Telecast, except as expressly permitted in this Agreement.

(B)     Company acknowledges that the Events are conducted, from time to time, in venues and locations in which The Recording Academy has no control over the existence or removal of signage, and that the presence of existing signage for competing products in those venues and locations arranged by the venue or location operator shall not in any way constitute a breach of this Agreement by The Recording Academy. The Recording Academy acknowledges that The Recording Academy has not yet committed to the venue(s) for all of the foregoing events and has no knowledge of existing signage.

(b) Reservation     of     Rights.     Company acknowledges and agrees that no rights (whether expressed or implied) to the GRAMMY Identification and all Campaign Elements are being granted to Company hereunder other than the limited licenses to use the GRAMMY Identification and the Campaign Elements as expressly described in this Agreement.  All other rights in the GRAMMY Identification and Campaign Elements are expressly reserved by The Recording Academy.

(c) No     Third     Party     Rights.     Company acknowledges and agrees that no rights have been granted herein to use the names, likenesses, characters, voices, music, lyrics, biographies, copyrights, designs, trademarks, or other identification of any of the individuals or recording groups who have received or been nominated to receive an annual GRAMMY Award or any other persons, properties or materials ("Third Party Rights").

(d) Other.

(A)     No     Sublicense     and     No Registration. The rights granted to Company in this Agreement by The Recording Academy are granted solely to Company and may not be sublicensed, assigned, or transferred by Company for any purpose, except as maybe

2



expressly provided herein with respect to Company Customers. Company agrees that it will not, during the Term or thereafter, use or seek to register any trademark, service mark, trade name or other indicia consisting of or incorporating any item of the GRAMMY Identification, or variations thereof, or commit any act that (i), except as expressly provided in this Agreement, represents or which has the effect of representing that The Recording Academy, respectively, manufactures, distributes, sponsors, approves, licenses or is in any manner associated and/or affiliated with Company's goods and/or services or (ii) otherwise infringes or causes to be infringed The Recording Academy's rights with respect to the GRAMMY Identification.

(B)   No Other Rights. Company agrees that: (i) nothing contained in this Agreement shall grant to Company any right, title or interest in or to the GRAMMY Identification and any Campaign Element, except for the limited rights expressly granted pursuant to this Agreement; (ii) each and every element of the GRAMMY Identification and Campaign Elements is and shall be the sole and exclusive property of The Recording Academy, respectively; and (iii) any and all use by Company of any part of the GRAMMY Identification and Campaign Elements and the goodwill associated therewith will inure to the exclusive benefit of The Recording Academy.

## 5.   Representations, Warranties, Covenants and Indemnification.

(a)   By The Recording Academy. The Recording Academy represents, warrants and covenants to Company: (i) it has the full corporate right, power and authority to enter into this Agreement, and to perform the acts required of it hereunder; and (ii) the execution of this Agreement by it, and the performance by it of its obligations and duties hereunder, do not and will not violate any agreement to which it is a party or by which it is otherwise bound; and (iii) Company's use of the GRAMMY Identification in strict accordance herewith within the United States of America shall not infringe or violate the rights of any person or entity.

(b)   By Company. In addition to those representations and warranties contained elsewhere in this Agreement, Company represents, warrants and covenants to The Recording Academy: (i) Company has the full corporate right, power and authority to enter into this Agreement, and to perform the acts required of it hereunder; (ii) the execution of this Agreement by Company, and the performance by Company of its obligations and duties hereunder, do not and will not violate any agreement to which Company is a party or by which it is otherwise bound; (iii) Company has, prior to the Term, produced, created, distributed, sold, promoted and advertised (and will during the Term produce, create, distribute, sell, promote and advertise) the its products in accordance with all applicable laws and regulations

(federal, local or foreign), and will otherwise comply with all applicable laws and regulations in connection with its performance and responsibilities under this Agreement; (iv) Company is the exclusive owner of the Company Identification within the Territory; (v) it has the full and unrestricted right and authority to grant to The Recording Academy the Company License; and (vi) it has the full and unrestricted right and authority without obtaining any further approval or consent of any third party to exercise the approval rights contained in Section 2 above.

(c)   Indemnification. Each of The Recording Academy and Company (as the case may be, the "Indemnifying Party") agrees to defend, indemnify and hold harmless the other and its parent, subsidiaries, affiliates, successors, licensees, agents, attorneys and assigns, and the officers, directors, members and employees of the foregoing (collectively, the "Indemnified Party"), from and against any and all losses, liabilities, damages, claims, costs and expenses (including outside attorneys' and accountants' fees reasonably incurred, subject to Section 5(d)) based upon third-party claims resulting from, or arising out of, (i) any breach of this Agreement (including any representation or warranty contained in this Agreement) by such Indemnifying Party, (ii) in the case of Company as the Indemnifying Party, any claims arising from liability based upon (A) the Promotional Sweepstakes or the Annual Awards Grand Prize Trip, and/or (B) the manufacture, sale, distribution, marketing, and/or promotion of its products or services, (iii) any violation of applicable law, regulation or order based upon the Indemnifying Party's performance, or failure to perform, under this Agreement, (iv) only in the case of Company as the Indemnifying Party, the use of the name, likeness, character, voice, biography, copyright, design, trademark, or other identification of any individual or performing group in connection with this Agreement and/or the failure to obtain any and all required Third Party Rights, including in connection with the Company Booth, the Hitlab Competition, the Contest Content and the Chinese music based TV show hosted and/or produced by Company, or (v) only in the case of Company as the Indemnifying Party, the use of the GRAMMY Word Mark or the Gramophone Logo anywhere in the Additional Territory.

(d)   Indemnification Process. The Indemnified Party shall promptly notify in writing the Indemnifying Party of any claim against the Indemnified Party which might give rise to a claim for which the Indemnifying Party is responsible under this Agreement, stating the nature and basis of the claim and, if known, the amount thereof. If a legal action or proceeding is brought against the Indemnified Party with respect to which the Indemnifying Party may have liability or responsibility under this Agreement, the Indemnifying Party shall have the right, without prejudice to the Indemnified Party's rights under this Agreement, at the sole expense of the Indemnifying Party, to be represented by counsel of Indemnifying Party's

3

own choosing (with whom counsel for the Indemnified Party shall confer in connection with the defense or any such action or proceeding) and, to the extent that it desires to do so, to assume the defense thereof with counsel approved by the Indemnified Party, which approval will not be unreasonably withheld. After notice from the Indemnifying Party to the Indemnified Party of the Indemnifying Party's election to so assume such defense, the Indemnifying Party shall not be liable to the Indemnified Party for any fees of other counsel or any other expenses incurred by the Indemnified Party, except where such expenses are incurred at the request of the Indemnifying Party in connection with the defense of any action or proceeding. The Indemnified Party shall make available to the Indemnifying Party and Indemnifying Party's counsel, all relevant documents and other materials relating to such action or proceeding and the parties shall cooperate with each other (at the Indemnifying Party's expense) in defending against such action. The Indemnifying Party shall not settle any claim without first notifying the Indemnified Party of the terms of any proposed settlement and obtaining its prior written consent thereto, not to be unreasonably withheld. The Indemnified Party shall have the right to participate in the defense of any claim that is subject to indemnification hereunder with counsel of its choice at its own expense.

(e) LIMITATIONS.   NOTWITHSTANDING ANYTHING TO THE CONTRARY STATED IN THIS AGREEMENT, AND EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 5(c) ABOVE AND BREACHES OF SECTIONS III, IV(l), 2, 3, 4(c) OR 4(d) HEREOF, THE MAXIMUM LIABILITY OF EITHER PARTY FOR ALL CLAIMS RELATED TO THIS AGREEMENT WILL NOT EXCEED THE TOTAL AMOUNT PAID BY COMPANY TO THE RECORDING ACADEMY UNDER SECTION V HEREOF.   EXCLUDING THOSE THIRD PARTY CLAIMS FOR WHICH ONE PARTY INDEMNIFIES THE OTHER UNDER SECTION 5(c) ABOVE AND BREACHES OF SECTION III, IV(l), 2, 3, 4(c) OR 4(d) HEREOF, EACH PARTY'S SOLE REMEDY AGAINST THE OTHER FOR LOSS OR DAMAGE ARISING OUT OF THE PERFORMANCE OR NON PERFORMANCE UNDER THIS AGREEMENT WILL BE PROVEN DIRECT, ACTUAL DAMAGES AND (ALSO SUBJECT TO THE IMMEDIATELY FOREGOING EXCLUSIONS), NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, RELIANCE, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF ITS PERFORMANCE OR NON PERFORMANCE UNDER THIS AGREEMENT, WHETHER OR NOT THAT PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

6.     **Submission and Notices**. All notices under this Agreement must be in writing in order to be effective, and shall be deemed to have been duly given or made (a) on the date delivered in person, (b) on the date indicated on the

return receipt if mailed postage prepaid, by certified or registered U.S. Mail, with return receipt requested, or (c) if sent by Federal Express, U.P.S. Next Day Air or other nationally recognized overnight courier service or overnight express U.S. Mail, with service charges or postage prepaid, on the next business day after delivery to the courier service or U.S. Mail with confirmation of receipt (if sent in time for and specifying next day delivery). In each case (except for personal delivery) such notices, as well as all requests, demands, and other communications shall be addressed as set forth above, unless otherwise indicated in a notice duly given hereunder and in the case of each notice to The Recording Academy under this Agreement, a copy shall also be sent to Greenberg Traurig, LLP, Terminus 200, 3333 Piedmont Road, NE, Suite 2500, Atlanta, Georgia 30305, Attn: Robert Rosenbloum, Esq.

7.     **Mutual Confidentiality**. Each party recognizes and acknowledges that it may receive certain confidential information and trade secrets concerning the business and affairs of the other party and/or its officers, executives, and affiliates which may be of great value to the disclosing party. Each party agrees not to disclose, for the Term and a period of five (5) years thereafter, unless required by law or legal order, any such information relating to the other party, The other party's personnel or operations, or any idea, project or other property being considered for use by the other party or being used by the other party and/or produced by the other party, or any of the terms or conditions of this Agreement (including this Agreement in its entirety or any documents delivered in accordance herewith), to any third party other than the receiving party's legal and financial advisors who need to know such information in order to render services on behalf of the receiving party, or in any way use such information in any manner which could adversely affect the other party's business. This provision imposes no obligation upon a receiving party with respect to confidential information which (a) was in the receiving party's possession before receipt from the disclosing party; (b) is or becomes a matter of public knowledge through no fault of the receiving party; (c) is rightfully received by the receiving party from a third party without a duty of confidentiality; (d) is disclosed by the disclosing party to a third party without a duty of confidentiality on the third party; (e) is independently developed by the receiving party; (f) is disclosed under operation of law; or (g) is disclosed by the receiving party with the disclosing party's prior written approval. If disclosing such information in response to a law or legal order, the receiving party shall give prompt prior written notice to the disclosing party and make a reasonable effort to protect and/or limit such information from unnecessary disclosure or use.

8.     Miscellaneous.

(a) Waiver; Assignment. The failure of either party at any time or times to demand strict performance

4



by the other of any of the terms, covenants or conditions set forth herein will not be construed a continuing waiver or relinquishment thereof and each may at any time demand strict and complete performance by the other of said terms, covenants and conditions. This Agreement and/or the rights granted to Company hereunder will not, without the prior written consent of The Recording Academy, which consent may be withheld in The Recording Academy sole discretion, be transferred or assigned by Company (by change of control, merger, operation of law or otherwise) to any other person or entity. Any assignment or purported assignment in contravention of the foregoing shall be null and void.

(b) Force Majeure. Except as otherwise provided in this Agreement, if the performance by any party of any obligation set forth in this Agreement is prevented by an act of God, act of war, act of terrorism, flood, tsunami, force majeure, or similar contingency or unexpected event, or for any other cause or causes beyond the control of any party, any such occurrence will be considered a valid excuse for non-performance or delay in the performance of the obligations hereunder. Nothing contained in this Section shall be construed or deemed to limit or otherwise relieve Company's obligation to pay any moneys due to The Recording Academy hereunder.

(c) Significance of Headings; Entire Agreement; Survival. Section headings in this Agreement are solely for aiding in the speedy location of subject matter and are not to be given weight in the construction of this Agreement. In case of any question with respect to the construction of this Agreement, it is to be construed as though such section headings had been omitted. This writing constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations and agreements, written, oral, or implied with respect to such subject matter, and may not be changed or modified except by a writing signed by both parties. Sections V, 1(b), 2(d), 4(b), 4(d), 5, 6, 7 and 8 shall survive the expiration or earlier termination of the Term.

(d) No Joint Venture/Tenancy. This Agreement does not constitute and will not be construed as constituting a partnership, joint venture or landlord/tenant relationship between The Recording Academy and Company, and neither The Recording Academy nor Company shall hold itself out to third parties to the contrary. For purposes of this Agreement, the parties shall be deemed to be independent contractors, and neither party shall have the right to legally bind the other party in any manner.

(e) Governing Law; Jurisdiction. THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF CALIFORNIA (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES UNDER CALIFORNIA LAW). THE CALIFORNIA COURTS (STATE AND FEDERAL), SHALL HAVE SOLE EXCLUSIVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY SHALL BE BROUGHT IN THOSE COURTS IN LOS ANGELES COUNTY, CALIFORNIA AND NOT ELSEWHERE. THE PARTIES WAIVE ANY AND ALL OBJECTIONS TO VENUE IN THOSE COURTS AND HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS. ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON A PARTY BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL OR BY OVERNIGHT COURIER OBTAINING PROOF OF DELIVERY, DIRECTED TO THE ADDRESS DESCRIBED IN SECTION 9 ABOVE OR SUCH OTHER ADDRESS AS A PARTY MAY DESIGNATE PURSUANT TO SECTION 9 ABOVE. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF CALIFORNIA.

(f) Press Releases. Except as expressly provided herein, no public statements or press releases by the parties (or their designees) concerning the existence or terms of this Agreement shall be made or released to any medium, except as required by law or with the prior written approval of Company and The Recording Academy.

(g) Counterparts. This Agreement may be executed in two (2) counterparts, each of which shall be deemed to be an original, and both of which taken together shall constitute but one and the same instrument. Signatures transmitted by facsimile shall be deemed to be originals. This instrument is not a binding agreement until signed by both parties and delivered to each party.

(h) Time is of the Essence. Time is of the essence with respect to all payments to be made under this Agreement. In addition to all other remedies available to The Recording Academy at law or in equity, all past due payments under this Agreement will bear interest at the rate of one and one half percent (1.5%) per month.

[END OF EXHIBIT A]

5



*Schedule 2*

**Company Identification**

[To be attached]



## *Schedule 1*

### GRAMMY Identification

[To be attached]

55ᵗʰ Awards Program:

After Party (the "After Party Logo"):     [include After Party Logo]



# EXHIBIT B

## FIRST AMENDMENT TO LICENSING AND PROMOTIONAL PARTNER AGREEMENT

**This FIRST AMENDMENT TO LICENSING AND PROMOTIONAL PARTNER AGREEMENT** (the "First Amendment"), is made and entered into effective this 4th day of February, 2013, by and between **NATIONAL ACADEMY OF RECORDING ARTS & SCIENCES, INC.**, a Delaware non-profit corporation with an office address of 3030 Olympic Blvd., Santa Monica, California 90404 ("The Recording Academy"), and **HITLAB INC.**, with an office address at 600 de Maisonneuve Blvd. West, Suite 2750, Montreal, Quebec, H3A 3J2, Canada ("Company").

The Recording Academy and Company entered into that certain Licensing and Promotional Partner Agreement - Multi-Jurisdictional, dated September, 2012 (the "Original Agreement"), and The Recording Academy and Company desire to amend the Original Agreement as set forth in this First Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth in this First Amendment, the adequacy and sufficiency of which are hereby acknowledged, the parties hereto, each intending to legally be bound, do hereby covenant and agree as follows:

**I.**     **Capitalized Terms**.  All terms used in this First Amendment with an initial capital letter that are not otherwise defined herein shall have the meanings ascribed to such terms in the Original Agreement.

**II.**     **Amendment to Section III(b)**.  The definition "TV Show Broadcast Period" found in Section III(b) of the Original Agreement is hereby deleted in its entirety and the following definition of "TV Show Broadcast Period" hereby inserted in lieu thereof:

" 'TV Show Broadcast Period' means the period commencing on that date which each Contract Year's Chinese Music TV Show first publically commences broadcasting and ending on March 31 of each such Contract Year;"

**III.**     **Amendment to Section IV(a)(ii)**.  Section IV(a)(ii) of the Original Agreement is hereby deleted in its entirety and the following Section IV(a)(ii) is hereby inserted in lieu hereof:

"(ii) for the first Contract Year, no additional tickets, for the second Contract Year, twelve (12) so-called 'Silver Tickets' and for any remaining Contract Year during the Term, six (6) so-called 'Silver Tickets'."

**IV.**     **Amendment to Section IV(g)**.  The phrase  "the Term" found in the first sentence of Section IV(g) of the Original Agreement is hereby deleted in its entirety and the phrase "either (i) for the first Contract Year occurring during the Initial Period, that Annual Awards Program occurring during the calendar year 2014 (the "Prize Shift"), or (ii) for the remaining Contract Years occurring during the Term, that Annual Awards Program occurring during such Contract Year" is hereby inserted in lieu thereof.

**V.**     **Amendment to Section V(a)(i)**.  Section V(a)(i) of the Original Agreement is hereby deleted in its entirety and the following Section V(a)(i) is hereby inserted in lieu hereof:

"(i)     for the first Contract Year, (1) Six Hundred Seventy-Four Thousand Nine Hundred Forty Dollars ($674,940) upon the full execution of this Agreement, and (2) Five Hundred Thousand Dollars ($500,000) on or before February 8, 2013; and"

**VI.**     **Affirmation and Counterparts**.  Except as expressly amended herein, the Original Agreement, and each of the parties' respective obligations, duties and responsibilities under the Original Agreement, shall remain in full force and effect. This First Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument.  Signatures transmitted by facsimile shall be deemed an original.

By signing below, the parties hereby acknowledge acceptance of the terms and conditions set forth in this First Amendment.

THE RECORDING ACADEMY:                         COMPANY:

**National Academy of Recording Arts**          **Hitlab, Inc.**
**& Sciences, Inc.**

By: _____ · 02/04/13            By: _____
Name: _Emil Greene_                         Name: PIERRE GAUTHIER
Title: _CMO_                                 Title: CHAIRMAN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge ___Ronald S.W. Lew___ and the assigned Magistrate Judge is ___Charles F. Eick___ .

The case number on all documents filed with the Court should read as follows:

### 14-CV-0652 RSWL-Ex

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

January 28, 2014
_____
Date

By  SBOURGEOIS
_____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| [x] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| NATIONAL ACADEMY OF RECORDING ARTS & SCIENCES, INC., a Delaware corporation | ) ) ) |
| *Plaintiff(s)* | ) ) ) |
| v. | ) ) |
| HITLAB INC., a Canada corporation | ) ) ) |
| *Defendant(s)* | ) ) |

Civil Action No.

CV14-0652 RSWL-Ex

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   HITLAB INC.
600 de Maisonneuve Blvd. West, Suite 2750
Montreal, Quebec
H3A 3J2
Canada

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Sandra A. Crawshaw-Sparks
Proskauer Rose LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:   JAN 2 8 2014                                    _____
*Signature of Clerk or Deputy Clerk*

1184

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself [ ] ) | DEFENDANTS ( Check box if you are representing yourself [ ] ) |
|---|---|
| NATIONAL ACADEMY OF RECORDING ARTS & SCIENCES, INC., a Delaware corporation | HITLAB INC., a Canada corporation |

| (b) County of Residence of First Listed Plaintiff   Los Angeles | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. | Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. |
|---|---|
| Sandra A. Crawshaw-Sparks, Esq. Proskauer Rose LLP 2049 Century Park East, Suite 3200 Los Angeles, CA 90067 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

[ ] 1. U.S. Government Plaintiff

[ ] 2. U.S. Government Defendant

[ ] 3. Federal Question (U.S. Government Not a Party)

[X] 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in this State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [X] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. ORIGIN** (Place an X in one box only.)

[X] 1. Original Proceeding

[ ] 2. Removed from State Court

[ ] 3. Remanded from Appellate Court

[ ] 4. Reinstated or Reopened

[ ] 5. Transferred from Another District (Specify)

[ ] 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** [X] Yes [ ] No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** [ ] Yes [X] No   [X] **MONEY DEMANDED IN COMPLAINT:** $ 1,675,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 USC Section 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| [ ] 375 False Claims Act | [ ] 110 Insurance | [ ] 240 Torts to Land | [ ] 462 Naturalization Application | **Habeas Corpus:** | [ ] 820 Copyrights |
| [ ] 400 State Reapportionment | [ ] 120 Marine | [ ] 245 Tort Product Liability | [ ] 465 Other Immigration Actions | [ ] 463 Alien Detainee | [ ] 830 Patent |
| [ ] 410 Antitrust | [ ] 130 Miller Act | [ ] 290 All Other Real Property | | [ ] 510 Motions to Vacate Sentence | [ ] 840 Trademark |
| [ ] 430 Banks and Banking | [ ] 140 Negotiable Instrument | **TORTS** | **TORTS** | [ ] 530 General | **SOCIAL SECURITY** |
| [ ] 450 Commerce/ICC Rates/Etc. | [ ] 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | [ ] 535 Death Penalty | [ ] 861 HIA (1395ff) |
| [ ] 460 Deportation | | [ ] 310 Airplane | [ ] 370 Other Fraud | **Other:** | [ ] 862 Black Lung (923) |
| [ ] 470 Racketeer Influenced & Corrupt Org. | [ ] 151 Medicare Act | [ ] 315 Airplane Product Liability | [ ] 371 Truth in Lending | [ ] 540 Mandamus/Other | [ ] 863 DIWC/DIWW (405 (g)) |
| [ ] 480 Consumer Credit | [ ] 152 Recovery of Defaulted Student Loan (Excl. Vet.) | [ ] 320 Assault, Libel & Slander | [ ] 380 Other Personal Property Damage | [ ] 550 Civil Rights | [ ] 864 SSID Title XVI |
| [ ] 490 Cable/Sat TV | | [ ] 330 Fed. Employers' Liability | [ ] 385 Property Damage Product Liability | [ ] 555 Prison Condition | [ ] 865 RSI (405 (g)) |
| [ ] 850 Securities/Commodities/Exchange | [ ] 153 Recovery of Overpayment of Vet. Benefits | [ ] 340 Marine | **BANKRUPTCY** | [ ] 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| [ ] 890 Other Statutory Actions | [ ] 160 Stockholders' Suits | [ ] 345 Marine Product Liability | [ ] 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) |
| [ ] 891 Agricultural Acts | [X] 190 Other Contract | [ ] 350 Motor Vehicle | [ ] 423 Withdrawal 28 USC 157 | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 871 IRS-Third Party 26 USC 7609 |
| [ ] 893 Environmental Matters | [ ] 195 Contract Product Liability | [ ] 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | [ ] 690 Other | |
| [ ] 895 Freedom of Info. Act | [ ] 196 Franchise | [ ] 360 Other Personal Injury | [ ] 440 Other Civil Rights | **LABOR** | |
| [ ] 896 Arbitration | **REAL PROPERTY** | [ ] 362 Personal Injury-Med Malpratice | [ ] 441 Voting | [ ] 710 Fair Labor Standards Act | |
| [ ] 899 Admin. Procedures Act/Review of Appeal of Agency Decision | [ ] 210 Land Condemnation | [ ] 365 Personal Injury-Product Liability | [ ] 442 Employment | [ ] 720 Labor/Mgmt. Relations | |
| | [ ] 220 Foreclosure | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 443 Housing/ Accomodations | [ ] 740 Railway Labor Act | |
| [ ] 950 Constitutionality of State Statutes | [ ] 230 Rent Lease & Ejectment | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 445 American with Disabilities-Employment | [ ] 751 Family and Medical Leave Act | |
| | | | [ ] 446 American with Disabilities-Other | [ ] 790 Other Labor Litigation | |
| | | | [ ] 448 Education | [ ] 791 Employee Ret. Inc. Security Act | |

CV14 - 0652

| FOR OFFICE USE ONLY: | Case Number: | | |
|---|---|---|---|
| CV-71 (11/13) | | CIVIL COVER SHEET | Page 1 of 3 |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII.  VENUE**:  Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court?    ☐ Yes  ☒ No    If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action?    ☐ Yes  ☒ No    If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?**  Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**  Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1.  Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D,  below.

If none applies, answer question C2 to the right.  ➡

**C.2.  Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D,  below.

If none applies, go to the box below.  ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above:  ➡ | Western |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed in **this court** that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _Jennika Crawshaw-Sparks_       DATE:  January 28, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |